Wildes *v.* Rural Homestead Co.

FRANK W. WILDES et al.

*v.*

THE RURAL HOMESTEAD COMPANY, JULIUS H. PRATT,
·HENRY F. TORREY, SAMUEL W. BOWER et al.

At the suit of individual stockholders of a corporation, a transaction of the directors, which, though *intra vires* and lawful in itself, is executed by them and the person with whom they deal, in pursuance of a scheme to make and perpetuate themselves directors in the control of the company, and is conspicuously unwise and injurious to the corporation and its stockholders, will be set aside in equity.

On bill, answer, replication and proofs.

*Mr. J. Flavel McGee*, for the complainants.

*Mr. Charles H. Voorhis*, for the defendants.

THE CHANCELLOR.

The object of the suit is to set aside a transfer of two hundred and thirty-eight shares of the capital stock of the Rural Homestead Company to one Samuel W. Bower, which, it is claimed, was effected by the directors of that company for a grossly-inadequate consideration, in bad faith, to the injury of the company and incidentally to the injury of the complainants, who are stockholders of the company ; the directors' motive in making such transfer being the perpetuation of themselves in office as directors.

It is disclosed that the entire capital stock of the company consists of two thousand four hundred shares of the par value of $50 each, and that all of the stock was issued, but that subsequently a portion of it came back to the company and was held in its treasury and disposed of from time to time to produce money for the needs of the corporation.

Immediately prior to the transaction now objected to, two hundred and thirty-eight shares of that capital stock remained in the treasury, the other shares being held by various stockholders, among whom were the defendants Julius H. Pratt, who owned eight hundred and ninety-one shares, and Henry F. Torrey, the son-in-law of Mr. Pratt, who held eighty-five shares, both of whom were officers and directors of the company. Mr. Pratt was the president and Mr. Torrey was the secretary and treasurer. Besides these, the defendants John Linn and his son, Clarence Linn, and David W. McCrea were directors, each holding one share of the stock.

The company was originally organized through the instrumentality of Mr. Pratt, for the purpose of disposing of land at Arlington, New Jersey, in building sites. But after the land had been laid out into lots, owing to the depreciation in real estate values, the original project so failed that it was concluded to abandon it and parcel out to the different stockholders the several lots into which the land had been divided, in proportion to their respective holdings of stock in the retirement of that stock. But after that determination had been partially carried into effect, a scheme was devised to organize a cemetery corporation, under the statutes of this state, to which the land should be conveyed, in order that, through such instrumentality, they might find a market. Accordingly, the major part of the land, divided into lots, approximately thirty-five acres, was returned to the company, and, on the 1st of December, 1882, was conveyed to the Arlington Cemetery Association, by which, in turn, it was to be sold in graves and graveyard lots for the burial of the dead.

The nominal consideration of the deed was $1, but, by concurrent agreement, it was arranged that the Homestead company, after it should expend $20,000 in surveying and laying out the lands for cemetery purposes, should receive one-half of the receipts from sales of graves and lots. The other half was to be used by the cemetery association in paying the expenses of conducting and maintaining the graveyard.

In 1883 this agreement was modified so that forty-five per

cent. of the receipts were to go to each corporation, and the remaining ten per cent. was to be retained and accumulated by the cemetery association as a fund for the perpetual maintenance of the cemetery.

Much of the stock held by Messrs. Pratt and Torrey was issued for land purchased, and it became necessary that stock in the treasury should be sold to meet the expenditures which were required to put the cemetery in operation. Accordingly, from time to time, stock was sold.

Among other purchasers of it were the complainant Daniel L. Shearer, of Boston, and others of the complainants who were induced by Mr. Shearer to invest in the enterprise. Mr. Shearer had been interested by Mr. Pratt, who had been his college class-mate, and in whom Mr. Shearer for a time reposed · implicit confidence.

From the outstart of this renewed enterprise, both corporations were controlled and managed by Messrs. Pratt and Torrey, who associated with themselves as directors such persons as they chose. The entire income from the sale of cemetery lots was insufficient to adequately conduct the enterprise, and consequently the share of it which otherwise, under the agreement referred to, would have gone to the Rural Homestead Company, was used for cemetery purposes, and for that share the Homestead company received merely credit in account with the cemetery association.

From 1885 to 1890 no elections for directors of the Homestead company were held, and the accounts of both corporations were so neglected that they were kept in the shape of loose memoranda and were not written up in books of account. The excuse for this neglect was the inability of Mr. Torrey to attend to all the duties which were thrown upon him, including the keeping of the accounts. The validity of that excuse has been disputed, but it is not pertinent to the present inquiry that such dispute should be determined. · It is sufficient for present purposes that the condition of the accounts and the fact that the cemetery company was deeply involved in debt, beyond that which it owed to the Homestead company, led to dissatisfaction

upon the part of the complainants, who, because they almost all reside in Boston, have been called "the Boston stockholders," and they insisted upon examining the accounts and having them written up, furnishing assistance to that end. They also insisted upon having Mr. Shearer made a director of the company, and he was, in June, 1890, so elected. Later in the summer of 1890 their dissatisfaction grew to such extent that the complainant Frank W. Wildes, one of them, declared that they would change the management of the company by taking it away from Messrs. Pratt and Torrey, and after that, in apparent fulfillment of his threat, commenced to buy up stock wherever he could find it for sale.

Though Mr. Shearer held over four hundred shares of stock he was not re-elected a director in 1891, but Mr. McCrea, a young lawyer and the owner of a single share, was chosen a director in his stead.

When the annual election in 1892 came, the Boston stockholders represented one thousand one hundred and twenty-four shares of stock, which they voted for a board of directors nominated by them, leaving the old management one thousand and thirty-eight shares in support of their ticket, which, with the two hundred and thirty-eight shares now claimed to have been fraudulently transferred to the defendant Bower, elected Messrs. Pratt, Torrey, John and Clarence Linn and Bower directors. Those gentlemen still retain the direction of the company.

The transaction complained of may be stated in this way : Mr. Bower is a lawyer of the State of New York, resident in the city of Brooklyn. In his professional capacity several years ago he became concerned for the estate of one Huntley, who in his lifetime was the owner of some lots of land at Arlington and also of several shares of the stock of the Rural Homestead Company. Through his concern in this property he became acquainted with Mr. Pratt and eventually was professionally employed by that gentleman.

Adjoining the Arlington cemetery is a tract of upland and meadow comprising some fifteen or sixteen acres, yet in rough, uncultivated condition, upon which there was erected an old frame

house of little value.   The tract formerly belonged to one John Van Emburgh, who, by his will proved in 1870, devised it to his daughter, Rachel Meyers, and her daughter Mary, as tenants in common.   Rachel Meyers, by her will, proved in September, 1883, devised her undivided half of the tract to her son, Moses C. Meyers, for the life of the daughter Mary, upon condition that Moses would support and care for his sister while she lived, she being of weak mind.   After the death of Mary, the undivided half was to be divided equally between six children of Rachel, who are named, among whom is the son Moses.

In 1886, Mary Meyers conveyed to her brother Moses her interest in about two acres of the land upon which the house stood.   Mary died, and thereupon Moses, as one of her heirs, took one-sixth of her interest in the property, which interest was one-half of the whole, less the two acres, and in virtue of his mother's will he also took one-sixth of the other undivided half.   Thus his entire holding became seven-twelfths of the two-acre lot and one-sixth of the remainder of the land.   He yet occupies the house.   I should say here that it was assumed at the argument that Moses Meyers obtained title to the whole two acres upon which the house was built.   I do not gather from the proofs this fact, but it is of little materiality one way or the other.   The taxes were suffered to remain unpaid, and, in 1887, the whole tract was sold, in enforcement of a tax lien, by the township authorities and bought in by the township for the term of thirty years.   In 1890 the defendant Bower took a conveyance from the township, paying some $900 in satisfaction of municipal liens.   He then commenced proceedings in ejectment against Moses Meyers, which were not defended against and in which a judgment by default was had.   Pending the sheriff's removal of Meyers from the premises, Meyers, in consideration of $1, conveyed his interest in the land to Mr. Bower and was accorded the right to stay upon the property, at a nominal rent, for three years.

Thus Mr. Bower secured a tax title to the whole property which has now some twenty-two years to run, and seven-twelfths or the whole of the two-acre lot and one-sixth of the remaining

property in fee, subject to the inchoate dower right of Moses' wife.

It is apparent that unless the other interests in this tract of land shall be secured, and until that time, the tract cannot be used for cemetery purposes. If the tax title be valid, it will not render the land available for cemetery purposes, because each succeeding year lessens its duration, and it is admitted that it is impossible to sell, to any appreciable extent, for burial purposes, for less term than a fee. If the deed from Moses Meyers to Mr. Bower be valid, it conveys only undivided interests and does not retrieve the situation. Until the outstanding interests can be had, the cemetery cannot safely afford to even clear and enclose the land. The only practical purpose seemingly served in such a purchase is to prevent the use of the land for a rival cemetery, but in face of the difficulties in the title and the fact that the cemetery is substantially in the country, adjacent to many as large parcels of unoccupied lands, this advantage is insignificant.

The ability of the company to control and utilize their property for cemetery purposes depends upon not only contingencies in title, but also upon the expenditure of further considerable sums of money.

Moreover, the complainants object that the tax title is not valid. Moses Meyers' wife refuses to part with her interest in the property, and Moses himself claims that the deed from him was had by fraud.

It is such interest in the land that Mr. Bower has exchanged for the two hundred and thirty-eight shares of the capital stock of the Rural Homestead Company.

The defendants claim that the exchange on the part of the company was made in the *bona fide* exercise of the directors' judgment for the best interests of the corporation. They urge that, for a long time before the exchange, persons interested in the cemetery deemed it desirable to have the Meyers land, not only to prevent its being converted into a rival cemetery, but also in order that the Arlington cemetery might be enlarged by it. They say that the undivided interest of the Meyers heirs,

other than Moses, may be purchased, and in that way title to the whole land may be perfected.

But confronting this excuse appear the facts that, when the purchase from Mr. Bower was made, the cemetery association was burdened with a large indebtedness, more than $7,000 of which was in the shape of judgments under which the cemetery company receipts were passing into the hands of sequestrators; that it was absolutely impossible for it to pay any part of its indebtedness to the Homestead company, or if the Homestead company should exact its forty-five per cent. of the current receipts from the sale of lots and graves, to maintain itself, and that it was not in need of additional land, because, in the ten years of its existence, it had not sold more than one-tenth of the land it already had.

It cannot but be concluded that, in face of the financial situation of the companies and the character of the property purchased, in absence of allegation or suspicion of bad faith, the transaction would have been conspicuously indiscreet and unwise. But it cannot be set aside merely because the directors acted indiscreetly or unwisely. It has not been suggested that the act was *ultra vires*, and the well-established rule is that individual stockholders cannot, in litigation, question the acts of directors *intra vires*, unless they can show that they are fraudulent in character. *Cook Stockh. § 684.*

In *Ellerman* v. *Chicago Junction Railway &c. Co., 4 Dick. Ch. Rep. 232,* Vice-Chancellor Green stated the rule upon this subject in this language:

"Individual stockholders cannot question, in judicial proceedings, the corporate acts of directors if the same are within the powers of the corporation and in furtherance of its purposes, are not unlawful or against good morals, and are done in good faith and in exercise of an honest judgment. Questions of policy, of management, of expediency, of contracts or actions, of adequacy of consideration not grossly disproportionate, of lawful appropriation of corporate funds to advance corporate interests, are left solely to the honest decision of the directors if their powers are without limitations and free from restraint. To hold other-

Wildes v. Rural Homestead Co.

wise would be to substitute the judgment and discretion of others in the place of those determined on by the scheme of incorporation."

In *Elkins* v. *Camden and Atlantic Railroad Co.*, *9 Stew. Eq. 241*, where an injunction was sought to restrain the making of certain contracts which were within the powers committed to the directors, Vice-Chancellor Van Fleet said :

" Unless the complainant has clearly demonstrated that in doing them [the acts sought to be enjoined] they will be controlled by a fraudulent or dishonest purpose and that injury will result to him, it is clear he has no case. * * * There can be no doubt that the question as to the expediency of making a contract, which is within the capacity of the corporation, is committed to the judgment of the managers of the corporation by whom alone it can act, and so long as they keep within the power committed to the corporation and act in good faith with honest motives and for honest ends, their acts are valid though the result may show that what they did was unwise and inexpedient."

The same judge repeats the rule thus stated in *Park* v. *Grant Locomotive Works*, *13 Stew. Eq. 114, 122.*

The question in the present case then is, was the transfer to Mr. Bower made in good faith and in the exercise of an honest judgment, to which judgment honest motives and ends are essential ?

A charge that directors do not act in good faith and with honest judgment must be established by evidence which is strong enough to overcome the usual presumptions in favor of good faith and honesty of purpose. The question in such a case is one of intent, which ordinarily is susceptible of establishment only by inferences from proved circumstances, for rarely is dishonest intent admitted. Those proofs must usually contend with excuse or reason, more or less plausible, which will be insisted upon as having been sufficient at the time of the act in question to command honest judgment in its favor, and hence the truth is not always susceptible of easy demonstration.

In the present case the complainants insist that the motive

which induced the transaction complained of was the perpetua-
tion of Messrs. Pratt and Torrey in control of the company, and
not the welfare of the enterprise in which the corporation had
embarked.    They point to the proof that they were dissatisfied
with the management of the homestead and cemetery companies
and the manner in which the accounts of those companies had
been kept, and that in consequence of that dissatisfaction Mr.
Wildes had threatened to change the management of the com-
panies ; also that he and others subsequently had commenced to
buy stock for that purpose, all of which was known to Messrs.
Pratt and Torrey.    Added to which facts they argue a conscious-
ness upon the part of Messrs. Pratt and Torrey that they could
not calculate upon a control of a majority of the stock issued,
and their appreciation of the plain problem that if to Mr.
Pratt's eight hundred and ninety-one shares and Mr. Torrey's
shares there should be added the two hundred and thirty-eight
shares remaining in the treasury of the company, the control of
a majority of the whole two thousand four hundred shares would
securely be theirs.

Then they call attention to the fact that the two hundred and
thirty-eight shares of treasury stock represented at par $11,900 ;
that twice in the history of the company, since its revivification
in 1882, although no dividends had been declared, money had
been raised by apportionment of treasury stock among the stock-
holders at par, and the two hundred and thirty-eight shares yet
in the treasury remained for similar purpose in the future ; that
the cemetery company had about reached the end of its power to
raise money ; that it had not only exhausted its own receipts,
but also the entire receipts of the homestead company, and, in
addition, had had recovered against it two judgments aggregating
about $7,000, under which sequestrators had been appointed to
absorb whatever they might lawfully lay their hands upon ; that
neither company could mortgage, for such action would effectually
remove the mortgaged property from the market which the ceme-
tery afforded, and that it was at this pecuniary crisis that Mr.
Bower, with a slender holding, by tax title and disputed deed
for an undivided interest in a few acres of rough, uncultivated

28

land, partly upland and partly meadow, bounding the southerly side of the cemetery, appeared upon the scene and was permitted to sweep from the treasury the remaining two hundred and thirty-eight shares of stock.

That the land in which Mr. Bower was interested was without market value I think is conspicuously demonstrated by the vast discrepancy in the values placed upon it by the several witnesses examined in that behalf, ranging from about thirty thousand dollars to about half as many hundreds of dollars. That it could not be utilized for cemetery purposes is made clear by the statement of the broken title and fractional interests whereby it was held. That it was not needed for the cemetery appears by the fact that in ten years not one-tenth of the land already owned by the cemetery had been disposed of.

When the transaction with Mr. Bower was in progress, although it was known by Messrs. Pratt and Torrey that the complainants were endeavoring to secure the control of a majority of the stock, and, for that reason, that they would most strenuously have resisted any disposition of the treasury stock which would not have given them an opportunity to acquire it, no notice of the intended transfer of it was given to them. Lastly, the event of the transaction was that Mr. Bower did, in fact, vote upon the stock transferred to him, to perpetuate Messrs. Pratt and Torrey in control of the company, when without such vote the complainants would have removed them.

Shortly recapitulated, the leading circumstances relied upon in proof of bad faith in the transaction objected to are—the dissatisfaction of the complainants with the management, their threat to change it, their effort to procure sufficient stock for that purpose, the uselessness of the purchase from Bower, the shocking indiscretion of that purchase in view of the financial condition of the cemetery and homestead companies in the absence of any necessity for an addition to the cemetery and the valueless character of that which was purchased, the secrecy observed in the transaction and the eventual use of the stock transferred to defeat the purpose of the complainants to change the management of the company.

I think that their strength is sufficient to overcome any presumption of good faith upon the part of the directors and Mr. Bower, and that the professions of good faith by those of them who were sworn, amounting, it may be said, to mere opinions, are entitled to but little weight against them.

The Messrs. Linn do not appear to have fully understood the situation of affairs, and, I think, under an insufficient realization of the exact situation, partly through indifference, because of their slight pecuniary interest and their great confidence in Mr. Pratt, and partly through lack of particular information, were led, without dishonest purpose, to acquiesce in that which Messrs. Pratt and Torrey advocated.

Messrs. Bower and Torrey possibly satisfied themselves that the transaction was lawful by the specious argument advanced in the excuse for it, to which I have adverted, under the predisposition thereto which their self-interest created. Messrs. Pratt and McCrea were not sworn. Mr. McCrea was not in the state when the testimony was taken, but Mr. Pratt was cognizant of the production of all the proofs, was the master spirit in the transaction, was declared by a witness to have said that he procured Mr. Bower to buy the land for the cemetery and yet remained silent.

I am of opinion that the transaction must be set aside, and will decree accordingly.